[Cite as *State v. Keahey*, 2014-Ohio-4729.]

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
ERIE COUNTY

State of Ohio                                    Court of Appeals No.  E-13-009

        Appellee                                 Trial Court No.  2011-CR-275

v.

Demetreus A. Keahey                              **DECISION AND JUDGMENT**

        Appellant                                Decided:  October 24, 2014

* * * * *

Kevin J. Baxter, Erie County Prosecuting Attorney, and
Mary Ann Barylski, and Frank Zeleznikar, Assistant
Prosecuting Attorneys, for appellee.

Brian J. Darling, for appellant.

* * * * *

**OSOWIK, J.**

{¶ 1} This is an appeal from a judgment of the Erie County Court of Common

Pleas, following a jury trial, in which appellant, Demetreus Keahey, was convicted of one

count of felonious assault, one count of attempted murder, one count of having a weapon

while under disability, and one count of improperly discharging a firearm at or into a habitation or school safety zone. After holding a sentencing hearing, the trial court sentenced appellant to serve a total of 23 years in prison. On appeal, appellant sets forth the following five assignments of error:

> I. The trial court erred to the prejudice of appellant and abused its discretion in declining to provide jury instructions on self-defense, an affirmative defense to the crime charged.
>
> II. The trial court erred to the prejudice of appellant and abused its discretion in declining to provide jury instructions on necessity, an affirmative defense to the crime charged.
>
> III. The trial court violated the defendant's Sixth Amendment right and abused its discretion in making findings of fact.
>
> IV. The trial court erred to defendant's prejudice in denying defendant's motion for a mistrial.
>
> V. The trial court's errors, when taken together, deprived appellant of the [sic] fair trial as guaranteed by the Fourteenth Amendment of the United States Constitution and Article I, Section Sixteen of the Ohio Constitution [sic] due Process Clauses.

{¶ 2} Appellant and Kindra McGill are the parents of a daughter, K.K. In addition, Kindra is the former girlfriend of Prince Hampton, who is the father of her two

2.

boys, P.H. and D.H. Because of several factors, including Kindra's affiliation with both appellant and Prince, an incident arose at the home of Kindra and appellant on May 7, 2011, during which Prince pulled a knife and stabbed appellant in the back. Appellant was hospitalized for several days with a collapsed lung. Neither Kindra nor appellant named Prince as the person who stabbed appellant. Consequently, no one was charged with a crime in that instance. However, on June 15, 2011, text messages were exchanged between appellant and Kindra, in which the two discussed Kindra's reluctance to name Prince as appellant's attacker, and also appellant's desire to retaliate against Prince for the stabbing.

{¶ 3} At some point after May 7, 2011, Kindra and her children began living with Kindra's mother, Joyce McGill, at 2015 Aspen Run Road in Sandusky, Ohio. On the morning of June 20, 2011, appellant drove to the Aspen Run Road house with the stated intent of picking up K.K. and Kindra so he could take them to the doctor's office for K.K.'s scheduled appointment. Appellant arrived early, parked his vehicle on the street in front of the house, and walked inside. After a brief conversation with Joyce appellant went back outside, where he saw a vehicle pulling into the driveway. In the vehicle were Prince, Kindra's two boys, and A.C., the young son of Prince's then-girlfriend.

{¶ 4} When Prince exited the vehicle, appellant drew a gun and fired several shots at Prince. One bullet hit Prince in the arm, and another went through his pants pocket,

3.

hitting him in the leg. That same bullet shredded a roll of paper money that was in Prince's pocket, causing confetti-like pieces of the bills to scatter on the ground.

{¶ 5} After appellant began firing at him, Prince ran down the street. At that point, appellant got into his car and drove away. While witnesses' accounts varied, it is undisputed that someone shouted "you are a dead nigga" as appellant's vehicle drove down the street. Prince collapsed several blocks from McGill's house. Neighbors called 911, medical assistance was dispatched to the scene, and Prince was taken to the hospital. Police arrived on the scene in response to neighbors' calls, where they discovered that one bullet had gone through the door of Prince's vehicle, and another one had gone through the outside wall and into the living room of McGill's neighbor, Brunell Hendrickson. Still another bullet was found under Prince's vehicle, and several more were later found on the ground in the surrounding area. In addition, a pair of flip-flop sandals and a closed pocket knife were found on the driveway near Prince's vehicle.

{¶ 6} After the altercation appellant fled to Erie, Pennsylvania. On July 25, 2011, while appellant was still in Pennsylvania, the Erie County Grand Jury indicted him on one count of drug possession (in an unrelated case), one count of felonious assault on Prince Hampton, in violation of R.C. 2903.11(A)(2), one count of attempted murder of Prince Hampton, in violation of R.C. 2903.02(A), three separate counts of felonious assault on P.H, D.H. and A.C., one count of having a weapon while under disability, in

4.

violation of R.C. 2923.13(A)(3), and one count of improperly discharging a firearm at or into a habitation or school safety zone, in violation of R.C. 2923.161(A).

{¶ 7} A jury trial was held on September 4, 5, 6, 7 and 10, 2012. Trial testimony was presented on behalf of the state by Joyce and Kindra McGill, Brunell Hendrickson, Jeremy Pruitt, Robert and Evelyn Brown, Eric Jensen, and various members of the Sandusky Police Department.

{¶ 8} Joyce testified that she did not see Prince with a knife or a gun on June 20, 2011. She stated that Kindra and appellant had planned to meet at the doctor's office that morning, however, appellant came to her house instead. Joyce said that she was in the doorway of the home when Prince drove up, and she saw Prince get out of the vehicle, and run to the front of the car, while the car was still running. Joyce also said that appellant "pulled out a gun and he started shooting." She then ran out of the house and yelled at appellant to stop, because her grandchildren were still in the car. After Prince and appellant left she closed the car door, picked up a pair of sandals from the grass and placed them in front of the car, and went inside to shower and change her clothes. She said that Kindra removed the children from the car. Joyce testified that later, at the police station, she stated that appellant walked down the driveway to the sidewalk after Prince ran away.

{¶ 9} Kindra testified that she heard it was Prince who stabbed appellant in May 2011, and she stated that Prince and appellant were angry at each other as a result of

5.

Prince's then-girlfriend stirring up trouble. Kindra also testified that appellant was supposed to meet her and children at the doctor's office on June 20, 2011, however, he came to her mother's home instead. She stated that Prince was 30 minutes late dropping off her sons at Joyce's house. Kindra further stated that she did not witness the incident, however, after hearing shots fired, she went outside and removed the children from the car. She did not recall seeing a knife or a hole in the car door. She did remember seeing the sandals on the ground.

{¶ 10} When questioned concerning the text messages sent between her and appellant on June 15, 2011, Kindra testified that they did not discuss appellant's intent to retaliate against Prince for the stabbing. Rather, she was expressing her desire to not be put in the middle of appellant's dispute with Prince because she and Prince had children together.

{¶ 11} On cross-examination, Kindra testified that she had gall bladder surgery two weeks before the shooting, but she was able to drive K.K. to the doctor's office without appellant's assistance. Kindra stated that she never saw appellant on June 20. She recalled seeing Prince with a knife and a gun on past occasions, but she denied knowing whether he habitually carries a weapon. She also stated that Joyce does not like appellant because he dated her older half sister in the past.

{¶ 12} On redirect, Kindra testified that she did not know whether appellant had a gun on June 20, however, she knew he was not allowed to have a gun. On recross,

6.

Kindra stated that her mother likes Prince, and has allowed him to see her children in the past without her knowledge.

{¶ 13} Brunell Hendrickson testified that she was in the kitchen of her home on East Oldgate Road on June 20, 2011, at approximately 8:55 a.m., when she heard six gunshots coming from nearby Aspen Run Road. She immediately called 911 to report the shooting. Seconds later, she heard two women screaming, followed by the sound of a car accelerating as it drove down Aspen Run toward her street. Brunell stated she then heard two more gunshots, and the last shot came through the wall of her house and landed in her living room. Brunell testified that, after the bullet came into her home, she laid down on the kitchen floor and called 911 again.

{¶ 14} Brunell said that she saw "a black man running down across the lots of the houses directly in front of [her]" before she heard the last shots. She described the accelerating car as "grayish looking," and identified appellant as the driver.

{¶ 15} On cross-examination, Brunell testified that she is angry at appellant for shooting a gun at her house, because she has a heart condition and should not be subjected to stress. Although she denied seeing appellant shoot a gun, she stated that she is familiar with appellant's face, she saw him driving the gray car, and she was sure he was the shooter. She did not remember seeing Prince with a gun.

{¶ 16} Jeremy Pruitt, Joyce's next door neighbor, testified that he heard three "pops" between 8:30 and 9:30 a.m. on June 20, 2011. As he picked up the phone to call

7.

911, he saw appellant, wearing jeans, a hoodie and a hat, walking down the street "to get into a vehicle." He also stated that another man was running down the street, and that he saw pieces of money on the ground at the end of his own driveway. On cross-examination, Pruitt testified that he did not see a knife. He further testified that he heard more shots after the first three, for a total of "10 or 12 shots," but he did not hear any more shots after appellant drove off. He could not see whether the man who was running had a weapon. On re-cross, Pruitt testified that he may have told police he saw a man in a white shirt running away from a man in a hoodie.

{¶ 17} Robert Brown, a resident of South Oldgate Road, testified that on June 20, 2011, a man ran up to his house, bleeding, stating that he had been shot and asking for assistance. While Brown and a neighbor, William Myers, tried to get the man to lay down, he heard someone yell "nigger, you're dead." He stated that police arrived shortly after his wife called 911.

{¶ 18} Brown stated there was a "big bullet hole" in the man's arm. He did not see a wound in the man's leg. He could not identify appellant as the driver of the car. Evelyn Brown, Robert's wife, testified that she heard shots on June 20, 2011, and saw a man running down the street. She then heard more shots, followed by someone driving past her home at a high rate of speed.

{¶ 19} Eric Jensen testified that he lives across the street on Aspen Run Road, "caddy-corner," from Joyce McGill's home. Jensen stated that he saw a "black guy in a

8.

white T-shirt" being chased by a "another black guy with * * * a hoodie on" who appeared to raise his arm and shoot at the man in the white shirt. Jensen said that, shortly after hearing the shot, he saw a car "take off." On cross-examination, Jensen testified that he does not know appellant, and he did not see Prince holding a knife. On redirect, Jensen said that he did not remember telling police he heard a woman screaming.

{¶ 20} Members of the Sandusky Police Department who testified at trial were Lieutenants Richard Braun and Danny Lewis, Detectives Ken Nixon and Gary Wichman, Officer Christopher Denny, and Assistant Chief John Orzech. Also testifying were Todd Wharton and Scott Desloover.

{¶ 21} Braun testified that he was dispatched to Aspen Run Road on June 20, 2011. However, before he got to that address, he saw a gunshot victim on the ground on Laurel Lane near South Oldgate. The man had a wound on his left arm and leg. Braun said the gunshot victim, whom he identified as Prince, was taken to the hospital. Braun then went to Joyce's house, where he found shell casings on the ground, and a bullet hole in the door of a car parked in the driveway. He also observed sandals and a knife on the ground near the car, a place in the yard where "the dirt was kicked up," and a blood trail leading away from the driveway toward the injured man on Laurel Lane.

{¶ 22} On cross-examination, Braun testified that he spoke to a witness, William Myers, who said he heard Prince and appellant yelling at each other. When the state objected to Braun's statement as hearsay, the defense indicated that Meyers, although

9.

present, would not be asked to testify because he is a "loose-canon." The trial court limited Braun's testimony to saying that he spoke to Myers, who reported hearing "a number" of shots. On redirect, Braun testified that the knife appeared to be closed in pictures taken at the scene.

{¶ 23} Following Braun's testimony, a conversation occurred between defense counsel, the prosecution and the trial court concerning appellant's claim of self-defense. The trial court warned defense counsel to research the issue thoroughly because, in order to assert self-defense, appellant had to admit shooting Prince and, in addition, appellant must present sufficient evidence to support self-defense to get the instruction. Testimony then resumed.

{¶ 24} Nixon testified at trial that he went with Prince to the hospital after finding him lying on the ground at 2020 South Oldgate. He identified a shirt and blue shorts that had bullet holes as the ones Prince was wearing when he was shot. Nixon said that Prince had bullet wounds in his left arm and left thigh. He stated that Prince had $1,265 in his pocket, and that some of the bills were "shredded" by a bullet, leaving pieces of money scattered on the ground. Nixon stated that Prince did not identify the person who shot him.

{¶ 25} Denny testified that he interviewed Jensen and Prewitt, who each said they heard three shots and then saw a black male in a hoodie chasing another black male who was wearing a white T-shirt.

10.

{¶ 26} Wichman testified that appellant has a prior felony narcotics conviction that prohibits him from possessing a firearm. He also testified that there is "bad blood" between appellant and Prince, due to an incident in May 2011 when Prince stabbed appellant. Wichman also testified that he interviewed Brunell Hendrickson, who was "in hysterics" after a bullet came through her living room wall. He then went to Joyce McGill's house, where he saw blood on the back of a nearby car, "confetti" on the driveway, and a bullet hole in a vehicle that was parked in the driveway. Also, he saw a closed pocket knife on the driveway. Wichman stated that the knife had a short "locking" blade. He also stated that Prince was more interested in the whereabouts of his money than in telling police who shot him.

{¶ 27} Wichman testified that appellant had a "retreat zone" that would have allowed him to get into his car without following Prince down the street. He further testified that, if appellant had retreated, he would not have fired the shot that went into Brunell's home. Wichman also testified that it was possible that Prince could have pointed a gun at appellant from the area where the pieces of money were found. However, he stated that no guns were ever found.

{¶ 28} Lewis briefly testified that he arrested appellant on an unrelated drug offense on October 7, 2001, which resulted in a felony conviction. Wharton, a forensic scientist in the Firearms and Toolmark Section of the Ohio Bureau of Criminal Identification and Investigation ("BCI"), testified that the weapon which fired at least

11.

five rounds at Prince was a semi-automatic, 9mm handgun. He further testified that it is possible all the bullets fired at Prince were from the same gun, however, the four remaining casings were too damaged to be certain. On cross-examination, Wharton testified that all nine bullets were 9mm Luger-type projectiles, but it was impossible to identify the shooter from looking at the bullets. He also testified that there are too many variables to say exactly how far a particular bullet would travel.

{¶ 29} Desloover, a Verizon Wireless employee, testified that he provided a record of the texts between appellant and Kindra, in response to a search warrant. The records of the texts were then admitted into evidence.

{¶ 30} Orzech testified that he was a Sandusky Police detective on June 20, 2011, and he responded to a call for police assistance at 1033 East Oldgate, the home of Brunell Hendricks. From a photograph, he identified a bullet hole in home's living room wall. He stated that the bullet taken from Brunell's home and a fragment found in Joyce's driveway were both 9mm Luger caliber, and both were fired from a barrel that had five lands and five grooves, and a right-hand twist. Orzech stated that he found a pair of gloves, a pair of sandals and a closed knife in Joyce's driveway. He also stated that a groove in the lawn could have been caused by a cartridge that skipped through the grass. He identified confetti-like pieces of money in the grass as coming from the roll of bills that was in Prince's pocket.

{¶ 31} Orzech stated that, in his opinion, the incident began in Joyce's driveway where four cartridge cases were found, and proceeded down the street where another shot was fired that struck Prince, causing the money to come out of his pocket. As Prince continued running, another shot was fired, which hit Brunell's house. Orzech testified that, according to his scenario, appellant would have been able to get into his vehicle and safely retreat when Prince started running. If that would have happened, the shot that entered Brunell's home would not have been fired.

{¶ 32} On cross-examination, Orzech testified that the bullet hole in Prince's vehicle was angled such that the shot would have come from the rear of the vehicle. Orzech disputed the defense's argument that more than one gun could have been used, based on the fact that all the casings could have come from the same firearm. He also testified that police searched the entire neighborhood but did not find a gun. Orzech stated that police could not establish that the knife on Joyce's driveway was involved in the incident. He also stated that the bullet that entered Prince's vehicle must have been fired while Prince was outside the car because it entered through the outside of the door and lodged inside the car. He had no opinion as to how the door may have been opened and later shut by Joyce.

{¶ 33} At the close of Orzech's testimony, the state rested. Defense counsel made a motion for acquittal pursuant to Crim.R. 29, which the trial court denied. Thereafter,

13.

the trial court and appellant engaged in the following exchange concerning the issue of a self-defense instruction:

Court: And the other concern that the Court brought up to the Bench was the fact that you are asserting a self-defense apparently. The Court's picking that up.

And there's [the] requirement of confession and then avoidance. In other words, you got [sic] to admit you did the crime and then say I'm avoid [sic] the liability for that crime because I have a defense. The court wants your client to know, and I'm sure you've already told him. Mr. Keahey, the court wants you to know if you choose to take the stand, just because you choose to take the stand, and if, in fact, you do admit to the crime, I don't know if you're going to do that or not, that does not automatically mean you're going to get the self-defense instruction to the jury. There's other criteria, other evidence that has to be proven, if you will, or set forth in order * * * to sustain the request for that jury instruction. So I don't want you under any mistaken belief that just because you admit, confess, if you will, that you avoid by getting that self, self-defense instruction. That's not automatic at all.

\* \* \*

I'm sure you've had an opportunity to talk to your counsel. I'm going to give you a little bit more time to talk to him before we bring the jury in, but I definitely want you to understand just because you take the stand and just because you admit it does not mean your're going to get that instruction, okay? It doesn't mean you won't, but it does not mean that you will. Understand that?

Appellant: Yes, sir.

{¶ 34} Defendant, who testified on his own behalf at trial, said that Joyce did not like him because he dated her older daughter, Angela, before he met Kindra. He also stated that he and Kindra "got along great" after K.K. was born. Appellant said that Prince stabbed him in May 2011 after the two men argued about how appellant treated Prince's children. Appellant said that he moved out of the apartment he shared with Kindra after the stabbing, because he "feared for his life."

{¶ 35} As to the events that occurred on June 20, 2011, appellant testified that he initially said he would meet Kindra and K.K. at the doctor's office. However, he changed his mind and went to Joyce's house because he did not want Kindra driving a car so soon after she had surgery, and because he wanted them to go "as a family." Appellant said that he arrived before 9 a.m. and went inside, however, he left the house when Joyce started to "pick on him" for not taking off his shoes. As he was walking toward his car, Prince drove into the driveway "real fast," causing appellant to back up

15.

against the house. When Prince hopped out of the car "with a knife," appellant "pulled out the gun" and fired at Prince. Appellant said that when he headed toward his car, he heard a shot. When he turned around, he saw Prince holding a gun. Appellant responded by firing several rounds at Prince as Prince ran away. Appellant said that he got into his car and drove off after Prince ran away.

{¶ 36} Appellant said that he would have "been dead" if he had not shot at Prince. Appellant also said that, as he drove off, he heard Prince say "nigga, you dead." Appellant testified that he went to Pennsylvania after the shooting, and did not return until three months later when he turned himself into Sandusky Police.

{¶ 37} On cross-examination by the prosecution, appellant testified that he was imprisoned in 2002 for 17 months following a drug conviction. Consequently, he is prohibited from possessing a firearm. Appellant also stated that he did not name Prince as the person who stabbed him in May 2011 because he was afraid he would be killed in retaliation. Appellant said he did not get into his car and leave when he first saw Prince at Joyce's house because Prince was driving fast, and he was scared. He said he "got rid of" the gun on his way back to Sandusky from Pennsylvania, because the police in Sandusky considered him "armed and dangerous" and he did not want to be "shot on sight."

{¶ 38} Appellant further testified that he could not run to his car before Prince ran away because he would have been shot in the back. He said he did not stop shooting,

16.

even though there were children in the car, because he was trying to protect himself.  He admitted bringing a firearm to Joyce's house, even though he is not permitted to carry a weapon.  Appellant stated that Prince initiated the altercation by jumping out of the car and coming toward him with a knife.  Appellant also stated that it was Prince, not appellant, who said "you're dead nigga."  Appellant agreed with the prosecutor's statement that "Prince pulls a knife, you pulled the gun, and you shot."

{¶ 39} At the close of appellant's testimony, the defense rested.  The state presented no rebuttal evidence.  The trial court and the parties then discussed proposed jury instructions, during which defense counsel renewed his request for an instruction on self-defense.  In addition, defense counsel asked for an instruction as to necessity in regard to the charge of having a weapon while under disability.  After hearing arguments from the defense and the prosecution, the trial court stated:

> In looking at the facts of the case, * * * the defendant, if you will, was at fault in creating the situation based on the testimony and text messages that were sent.  He was supposed to go to the doctor's, and, instead, he came to the house.  He brought a firearm with him to the house.
>
> The victim, one of the victims, Prince Hampton, ran from the defendant.  The defendant chased him.  The defendant had a means of escape, his own vehicle, which was parked across the street.  * * *

17.

The Court doesn't find that the defendant - - the Court finds he did create the – he did create the fault. He was at fault in creating the situation that gave rise to it. Whether or not he had a bona fide belief that he was in imminent danger of death or great bodily harm and there was no other means of escape, the Court finds there was a means of escape and also that he did violate his duty to retreat, and he had every opportunity to retreat. So the court finds that the defense of self-defense, that instruction will not be given.

**{¶ 40}** The trial court noted the defense's objection to its ruling. Thereafter, closing arguments were presented by the state and the defense, after which jury instructions were given and the jury retired to deliberate. On September 10, 2012, the jury returned a verdict of guilty to one count of felonious assault and one count of attempted murder of Prince, one count of having a weapon while under disability, and one count of improperly discharging a firearm at or into a habitation or school safety zone. Not-guilty verdicts were returned as to felonious assault on P.H., D.J. and A.C. The remaining charge of drug possession was later dismissed. On October 4, 2012, the trial court sentenced appellant to serve a total of 23 years in prison.

**{¶ 41}** On October 19, 2012, a timely notice of appeal was filed. On December 4, 2012, this court found that the judgment of conviction was not a final, appealable order,

18.

and remanded the matter to the trial court. On December 17, 2012, the trial court filed a nunc pro tunc judgment entry in response to our mandate, and the appeal was reinstated.

{¶ 42} In his first assignment of error, appellant asserts that the trial court erred by refusing to instruct the jury as to the affirmative defense of self-defense. In support, appellant argues that the trial court improperly found that his testimony was not credible and refused to give a self-defense instruction on that basis.

{¶ 43} In *State v. Lillo*, 6th Dist. Huron No. H-10-001, 2010-Ohio-6221, ¶ 15, this court stated:

> Generally, requested jury instructions should be given if they are a correct statement of the law as applied to the facts in a given case. *Murphy v. Carrollton Mfg. Co.*, 61 Ohio St.3d 585, 575 N.E.2d 828 (1991). A court's instructions to a jury "should be addressed to the actual issues in the case as posited by the evidence and the pleadings." *State v. Guster*, 66 Ohio St.2d 266, 271, 421 N.E.2d 157 (1981). Prejudicial error is found where, in a criminal case, a court refuses to give an instruction that is pertinent to the case, states the law correctly, and is not covered by the general charge. *State v. Sneed,* 63 Ohio St.3d 3, 9, 584 N.E.2d 1160 (1992).

{¶ 44} Appellant correctly states that the inquiry into whether sufficient evidence has been presented to raise an affirmative defense is a matter of law that is reviewed de

novo. *State v. Belanger*, 190 Ohio App.3d 377, 2010-Ohio-5407, 941 N.E.2d 1265 ¶ 4 (3d Dist.). However, the trial court's ultimate decision to refuse the requested jury instructions will not be overturned on appeal absent a finding of abuse of discretion. *Lillo,* supra, citing *State v. Wolons*, 44 Ohio St.3d 64, 68, 541 N.E.2d 443 (1989).

{¶ 45} In cases where the requested instruction involves an affirmative defense, the accused must show that he or she "has introduced sufficient evidence which, if believed, would raise a question in the minds of reasonable people concerning the existence of that defense." *State v. Carter*, 4th Dist. Ross No. 10CA3169, 2010-Ohio-6316, ¶ 58, citing *State v. Melchior*, 56 Ohio St.2d 15, 381 N.E.2d 195, paragraph one of the syllabus. It is the duty of the defendant to "first present sufficient evidence at trial to warrant such an instruction." *Belanger*, at ¶ 3. Such evidence is to be viewed in a light most favorable to the defendant. *Id.* Nevertheless, the trial court may "omit any requested instructions that are not correct statements of the law and applicable to the case before it." *Id.*, citing *State v. Scott*, 26 Ohio St.3d 92, 497 N.E.2d 55 (1986).

{¶ 46} In Ohio, "self-defense is an affirmative defense that legally excuses admitted criminal conduct." *State v. Edwards*, 1st Dist. Hamilton No. C110773, 2013-Ohio-239, ¶ 5. To demonstrate the affirmative defense of self-defense through deadly force, an accused must show by a preponderance of evidence that:

> (1) [they were] not at fault in creating the situation giving rise to the affray, (2) [they] had a bona fide belief that they were in imminent danger

20.

of death or great bodily harm and their only means of escape from such danger was the use of such force, and (3) [they] must not have violated any duty to retreat or avoid the danger. *State v. Robbins*, 58 Ohio St.2d 74, 338 N.E.2d 755 (1979), paragraph two of the syllabus.

{¶ 47} As to the first element, appellant testified at trial that he decided at the last minute to drive to Joyce's house instead of meeting Kindra and K.K. at the doctor's office, and he did not know that Prince would be dropping off his sons while appellant was there. Appellant also testified that he pulled out a gun and shot at Prince because Prince had a knife in his hand and, based on the events that occurred six weeks earlier, appellant was afraid that Prince would stab him. Appellant stated that he did not immediately retreat to his vehicle because Prince pulled out a gun and he was afraid he would be shot in the back if he turned to leave.

{¶ 48} Before denying appellant's request for a self-defense instruction, the trial court noted that appellant unilaterally decided to pick up Kindra and K.K., and that text messages exchanged between appellant and Kindra established a possible motive for appellant to attack Prince. The trial court also stated that appellant had a means of escape, which he failed to utilize. Other trial testimony established that no witnesses saw Prince with a gun, no gun was ever recovered, and the only knife that was found at the scene was closed and lying on the ground.

21.

{¶ 49} It is undisputed that appellant and Kindra had agreed to meet at the doctor's office. Appellant's stated motive for changing his mind and going to pick up Kindra and K.K. opened the door to the trial court's consideration of other motives, including the content of the text messages exchanged by appellant and Kindra. In addition, appellant testified that he carried a gun that morning despite the fact that, as a convicted felon, he is prohibited from carrying a firearm.

{¶ 50} As to the third element, appellant's duty to retreat, undisputed testimony was presented that appellant arrived at Joyce's home in a vehicle, which he parked nearby on the street. Although appellant testified that he was afraid to turn his back on Prince and get into the vehicle, no testimony was presented as to why appellant could not have retreated in any other direction, or by any other method.

{¶ 51} After considering the entire record in a light most favorable to appellant, we find that appellant failed to produce sufficient evidence to meet his burden as to the first and third elements of the affirmative defense of self-defense. A consideration of the second element, which required appellant to show that he reasonably believed he was in imminent danger of death or serious bodily harm, is unnecessary. State v. Robinson, 132 Ohio App.3d 830, 726 N.E.2d 581 (1st Dist., 1999).

{¶ 52} Based on the foregoing, we conclude that the trial court did not err or otherwise abuse its discretion by refusing to provide the jury with a self-defense instruction. Appellant's first assignment of error is not well-taken.

22.

{¶ 53} In his second assignment of error, appellant asserts that the trial court erred by not instructing the jury as to the affirmative defense of necessity, as it relates to his conviction for carrying a weapon while under disability. Citing State v. Crosby, 6th Dist. Lucas No. L-03-1158, 2004-Ohio-4674, appellant argues that that he presented sufficient evidence to support such a defense, which "excuses a criminal act when the harm which results from compliance with the law is greater than that which results from a violation of the law."

{¶ 54} As set forth above, "a trial court's determination as to whether the evidence produced at trial warrants a particular instruction is reviewed for an abuse of discretion." Burns v. Adams, 4th Dist. Scioto No. 12CA3508, 2014-Ohio-1917, ¶ 52. "A party must demonstrate not merely that the trial court's omission or inclusion of a jury instruction was an error of law or judgment but that the court's attitude was unreasonable, arbitrary or unconscionable." Freedom Steel v. Rorabaugh, 11th Dist. Lake No. 2007-L-087, 2008-Ohio-1330, ¶ 10.

{¶ 55} The defense of necessity is not codified in Ohio law, however, Ohio courts have held that the common-law elements of the defense are:

(1) the harm must be committed under the pressure of physical or natural force, rather than human force; (2) the harm sought to be avoided is greater than (or at least equal to) that sought to be prevented by the law defining the offense charged; (3) the actor reasonably believes at the

23.

moment that his act is necessary and is designed to avoid the greater harm; (4) the actor must be without fault in bringing about the situation; and (5) the harm threatened must be imminent, leaving no alternative by which to avoid the greater harm. Dayton v. Thornsbury, 2d Dist. Montgomery Nos. 16744, 16772, 1998 WL 598124 (Sept. 11, 1998).

{¶ 56} Traditionally, the defense of necessity requires pressure from physical forces, as opposed to the defense of duress, which involves a human threat. Id. In this case, appellant testified at trial that he was forced to carry a gun because he was afraid of Prince, in spite of the fact that he was legally forbidden to do so. Accordingly, appellant has not established that the harm in this case resulted from anything other than human action, as opposed to a physical force. In addition, as stated in our determination of appellant's first assignment of error, appellant failed to establish that he was not at fault in creating the situation that led to his decision to fire his gun, wounding Prince and endangering the safety of children and nearby adults.

{¶ 57} On consideration of the foregoing, we find that appellant has failed to establish the elements necessary to support a jury instruction on the affirmative defense of necessity. Accordingly, we cannot say that the trial court abused its discretion by refusing to give such an instruction. Appellant's second assignment of error is not well-taken.

24.

{¶ 58} In his third assignment of error, appellant asserts that the trial court abused its discretion by making findings of fact. Specifically, appellant argues that the trial court usurped the function of the jury by "finding" that he came to Joyce's house instead of going to a doctor's appointment, he had a gun, Prince ran away from appellant, appellant chased Prince, appellant "had a means of escape," appellant "could have avoided Prince," appellant threatened Prince, Prince had a knife, appellant "created the situation," and appellant "had a means of escape."

{¶ 59} In this case, the "findings of fact" that appellant disputes were made by the trial court in the context of determining whether appellant met his burden to go forward with evidence of the affirmative defenses of self-defense and necessity. Consequently, rather than making findings that bear directly on appellant's guilt or innocence, the trial court was discharging its duty to make preliminary determinations as to whether the requested jury instructions were warranted. Appellant's third assignment of error is, therefore, not well-taken.

{¶ 60} In his fourth assignment of error, appellant asserts that the trial court erred by denying his request for a mistrial. In support, appellant argues that the prosecutor prejudiced the jury by stating that appellant was "scary" when no such facts were in evidence. We disagree, for the following reasons.

{¶ 61} The trial court's decision to grant or deny a mistrial will not be overturned on appeal absent a finding of abuse of discretion. *Burns v. Adams*, 4th Dist. Scioto No.

25.

12CA3508, 2014-Ohio-1917, ¶ 53, citing *State v. Sage*, 31 Ohio St.3d 173, 182, 510 N.E.2d 343 (1987). "A mistrial should only be granted where the party seeking the same demonstrates that he or she suffered material prejudice so that a fair trial is no longer possible." *Id*., citing *Quellos v. Quellos,* 96 Ohio App.3d 31, 643 N.E.2d 1173 (8th Dist.1994), citing *State v. Franklin,* 62 Ohio St.3d 118, 580 N.E.2d 1 (1991). "The trial court is in the best position to determine whether the circumstances warrant the declaration of a mistrial." *State v. Simmons,* 1st Dist. Hamilton No. C-130126, 2014-Ohio-3695, ¶ 66, citing *State v. Ahmed,* 103 Ohio St.3d 27, 2004-Ohio-4190, 813 N.E.2d 637, ¶ 92.

{¶ 62} The record shows that, during cross-examination, appellant stood up several times while answering the prosecutor's questions. At one point, the following exchange occurred:

Question: Sit down, please.

Answer: I can't even stand?

Question: You're scaring me.

Court: Wait a minute. Approach.

{¶ 63} Outside the hearing of the jury, the following took place:

Prosecutor: I don't like the way he gets up and goes like this.

Court: Okay, but you can't do that.

Prosecutor: I know.

26.

Court:  You can approach and you can ask me to have him sit down.

You can't do that.

Prosecutor:  I know.

Court:  I don't want the jury being tainted.

Defense:  Yeah, I –

Court:  Okay?  I'll take care of it.

Defense:  I'd almost ask for a mistrial for that.

Court:   No, there's no mistrial there.  Your request for a mistrial is denied.  I'll give a curative.

Ladies and gentlemen of the jury, the comment by the prosecutor is stricken.  You're not to consider that.  Continue, State of Ohio.

{¶ 64} On consideration of the foregoing, and in light of the trial court's curative instruction, we find that appellant has not demonstrated that he suffered material prejudice such that a fair trial was no longer possible.  Accordingly, we cannot find that the trial court abused its discretion by denying the motion for mistrial.  Appellant's fourth assignment of error is not well-taken.

{¶ 65} In his fifth assignment of error, appellant asserts that the trial court's errors, taken together, deprived him of his right to a fair trial under the constitutions of the state of Ohio and the United States.  Appellant argues that the only effective remedy in this case is for this court to order the reversal of his conviction.

27.

**{¶ 66}** Before considering the effect of alleged "cumulative error," it is incumbent on this court to find that the trial court committed multiple errors. *State v. Wharton*, 4th Dist. Ross No. 09CA3132, 2010-Ohio-4775, ¶ 46, citing *State v. Harrington*, 4th Dist. Scioto No. 05CA3038, ¶ 57. Having determined that no such errors exist on the part of the trial court, we find that the principle of cumulative error is inapplicable in this case. Appellant's fifth assignment of error is, therefore, not well-taken.

**{¶ 67}** The judgment of the Erie County Court of Common Pleas is hereby affirmed. Appellant is ordered to pay the costs of the appeal pursuant to App.R. 24.

Judgment affirmed.

A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. *See also* 6th Dist.Loc.App.R. 4.

Mark L. Pietrykowski, J.                            _____
                                                                  JUDGE

Thomas J. Osowik, J.

                                                                 _____

James D. Jensen, J.                                  JUDGE
CONCUR.

                                                                  _____
                                                                 JUDGE

This decision is subject to further editing by the Supreme Court of Ohio's Reporter of Decisions. Parties interested in viewing the final reported version are advised to visit the Ohio Supreme Court's web site at: http://www.sconet.state.oh.us/rod/newpdf/?source=6.